UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STEVEN LANGLEY                                    CIVIL ACTION

VERSUS                                            NO. 16-1607

SGT. BEAU BOWMAN                                  SECTION "H" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Steven Langley, is a prisoner currently incarcerated in the B.B. "Sixty" Rayburn Correctional Center ("Rayburn") in Angie, Louisiana. He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Sgt. Beau Bowman, a Rayburn correctional officer. Langley alleges that, while he was incarcerated in Rayburn in late 2015 and early 2016, Bowman opened plaintiff's legal mail during a routine search of his cell in retaliation for his having filed grievances against Bowman, filed false disciplinary charges against plaintiff resulting in the loss of substantial "good time" credit and denied Langley's request for protective custody. Plaintiff seeks injunctive relief and monetary damages. Record Doc. No. 4 (Complaint at ¶ V).

On April 28, 2016, I conducted a telephone conference in this matter. Record Doc. No. 15. On June 23, 2016, I conducted a second telephone conference concerning the claims asserted in plaintiff's amended complaint. Record Doc. No. 16. Participating were plaintiff pro se and Michael Keller, counsel for defendants. At both hearings, plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## THE RECORD

During the initial <u>Spears</u> hearing, plaintiff testified that he is currently incarcerated in Rayburn based upon his conviction on July 27, 2012, of three counts of simple burglary for which he is serving a sentence of ten (10) years in prison.  He testified that he asserts four kinds of claims in this case:  (1) Sgt. Bowman improperly opened plaintiff's outgoing legal mail during a routine search.  (2) The opening of Langley's mail was in retaliation for having filed grievances against Bowman.  (3) Bowman filed false disciplinary reports against plaintiff that resulted in his loss of good time credits.  (4) Langley was denied protective custody classification forms to fill out so that the disciplinary board could hear his request.

As to his claim that Sgt. Bowman improperly opened his outgoing legal mail, Langley confirmed that the search and opening of his mail occurred on January 7, 2016. He stated that he was housed in a unit called "Level One" on that date when Bowman entered his cell, "opened a bunch of outgoing legal mail . . . and had it all over my bed, and he said, 'you shouldn't write ARP's [administrative remedies procedure grievances] against me because we're going to be here a long time together.'  I said, 'You did this out of retaliation,' and he just walked away."

Langley testified that his mail included one letter to the United States District Court for the Middle District of Louisiana in Baton Rouge and letters to the Rayburn warden.  He said that the letter to the federal court in Baton Rouge concerned a civil case he had filed

there against officials of the Dixon Correctional Institute.  He stated that the case had been dismissed for "lack of evidence supporting the claim" and that the letter Bowman opened was to the clerk of that court, requesting information about the case.  Langley stated that, after Bowman left the cell, Langley put the opened letter to the court in another envelope and mailed it to the clerk that day.  Similarly, he said that the letters to the Rayburn warden that Bowman opened and threw on the bed were placed in another envelope after Bowman left and that Langley sent them to the warden.  He stated that these letters were about "issues I was having" with the prison administration.

Concerning his retaliation and protective custody claims, Langley testified that in December 2015 he was in "administrative segregation refusing to go to Level 2 because I was in fear of my life."  Langley stated that he was then housed in a strict "extended lockdown" setting for disciplinary reasons and that the proposed move to Level 2 was to a less restrictive housing unit based upon good behavior for 90 days in the stricter unit.  He explained that "Level 1" is the "extended lockdown" stricter level, and "Level 2 is a little more freedom."  Langley said he refused several times to be moved because he was classified as "vulnerable" and in need of protection from "predators," but Bowman responded that he was "just going to put you with the biggest black dudes we can find."  Langley said he responded that he "was not going" and that he refused to be transferred several times because he "felt threatened" by some of the particular offenders already housed in Level 2.  He stated that the board denied him protective custody because they

3

questioned these other offenders and believed the other offenders over Langley regarding whether any threat was presented.

Langley identified one of the offenders whom he feared as "Lewis," but he could not remember the names of "two or three others." He stated that he had had prior "issues" with these other offenders while on Level 1, including "fighting back and forth, they're calling me names . . . telling me they're gonna get me down the walk and stuff." He explained that these were all "verbal altercations," not physical altercations. Langley stated that he has a right to be protected, felt threatened and therefore had a right to protective custody, but was denied protective custody every time he requested it.

Langley said he filed grievances against Bowman because Bowman tried to place him in Level 2 with these other offenders "in fear of my life" and refused to place him in protective custody. Langley admitted that he was never placed in Level 2 with any of the other offenders whom he feared, but only because "I kept on refusing" to be moved and he was "knocked back" to Level 1 based upon the disciplinary writeups he received based upon those refusals. He testified that he was moved to Level 2 in mid-March 2016, but by that time the other offenders whom he feared had been moved away from that area, so that he was never housed with any of them.

As to his claim that Bowman filed false disciplinary charges against him which cost him good time credit toward early release, Langley testified that these charges involved his disobedience to the transfer orders to Level 2. Langley admitted that he disobeyed those

transfer orders by refusing to be moved, but claimed that he had a good reason for doing so because of the threat he felt and because he should have been in protective custody, which prison officials had refused.

Langley testified that he was disciplined as to all of these charges and that his penalty included not just remaining in Level 1 "extended lockdown," but also loss of good time credits.  He acknowledged that he received written descriptions from Bowman of the "four or five" charges against him based upon his several refusals to be moved, each time the charges were made.  He testified that he received "several hearings" before the disciplinary board during December 2015 each time he was charged.  He stated that the disciplinary board at those hearings consisted of two members per hearing, including a chairman, Major Crawford, and one other.

Langley testified that he filed an administrative remedies procedures grievance and was seen by Colonel Anderson at Rayburn in response to the grievance before this series of disciplinary hearings occurred.  Plaintiff testified that Anderson told him that "if I didn't go to Level 2 [and] stop being scared, . . . I would be losing on all these writeups . . . [and] automatically . . . he would take good time from me, so it was already predetermined that if I got all of these writeups and refused to go to Level 2 that I would lose the good time."

Langley said that no witnesses were presented at the disciplinary hearings, but that the disciplinary board received both the incident reports and his own testimony.  He acknowledged that he was afforded the opportunity to provide his own testimony, during

5

which he told the board members about his protective custody requests and why he felt he should receive protective custody.  He stated, however, that the board members at each hearing denied those requests and accepted the word of the other inmates whom he feared that they posed no threat over Langley's own testimony.  Plaintiff testified, "Every time I put a protective custody form in, they questioned the other inmates; the inmates would state, 'I don't know him,'" and the board concluded that there was no evidence to support his request for protective custody.  Langley stated that his response was always:  "I feel threatened.  I am not going to Level 2.  You are violating my constitutional rights.  You are threatening my safety and well-being. . . .  I was trying to avoid being attacked."

Langley admitted that he was never attacked by any other inmates, but claimed it was only because he refused to be moved to Level 2.  He explained that the basis for his fear was  "past altercations, verbal altercations with these offenders" and staff members' threats to place him in cells with friends of these offenders.  He said he has lost a total of about 750 days of good time, including about 365 days based upon these charges concerning his refusal to be transferred from Level 1 to Level 2 and other days for his various attempts to commit suicide while in jail.  Langley stated that his constitutional rights were violated and that his life was in danger because of Bowman's actions.  On cross-examination, Langley testified that the same board that considered the disciplinary charges against him also considered his requests for protective custody.

After the hearing, Langley filed an amended complaint asserting new claims and naming two new defendants. Accordingly, I conducted a second <u>Spears</u> hearing exclusively for purposes of addressing the allegations made in plaintiff's amended complaint. During the second hearing, Langley testified that his first new claim is against defendant Sergeant Goings – whose first name he did not know – arising from an assault that occurred on March 25, 2016.

Langley stated that he was placed on a "suicide watch" in "four-point restraints" on March 24, 2016 by Amy Stotter, a mental health case worker, on orders of Dr. McVea at the jail. Langley testified that he was placed in that status because "I sliced my arm wide open" attempting "to commit suicide" on March 23rd. He stated that Sgt. Goings entered his cell two days later, while he was in four-point restraints, with Lt. Mathews, and that Sgt. Bowman was also present. He said that the officers removed him from the four-point restraints and placed him in less restrictive handcuffs so that Langley could eat and use the bathroom. Plaintiff testified that the officers had to remove the handcuffs after he finished eating and using the bathroom, so that he could be returned to four-point restraints while remaining on suicide watch. Langley alleged that Goings used excessive force and hurt him while removing the handcuffs.

Specifically, Langley alleged that the officers "were having trouble getting one [handcuff] off." He said that at that point Goings told Bowman to "block the camera" and "they twisted my arm real hard and pulled the restraint off." He testified that the twisting

of his right arm "back and forth" and attempting to yank the handcuff off was excessive force and that the camera was intentionally blocked so that the incident would not be filmed. Langley testified that the officers first tried to remove the handcuff with a key, but the key would not work, so "they jerked it so hard that it hurt my arm." He stated that the key finally worked after what "felt like" ten minutes, but it may have taken between five and ten minutes.

Asked what injuries he suffered as a result of the twisting of his arm, Langley said "numbness in my right arm" during which he lost feeling in his arm "for a few minutes." He stated that the feeling returned and the numbness dissipated when he moved his arm around after the pulling stopped. He said that Sgt. Bowman had been served with the summons in the instant lawsuit on the day before this incident occurred, Record Doc. No. 14, so that Bowman and Goings had twisted his arm in retaliation for receiving the summons. Plaintiff said that Goings twisted his arm and that, by doing so, Goings was retaliating on Bowman's behalf. Langley described the injury he suffered as a result of the arm-twisting as "minor" and said that the incident occurred between 10:30 a.m. and noon. He alleged that a surveillance video of the incident was taken, that it should be retained on file and that he sees no reason why it should have been discarded.

Plaintiff testified that he was released from suicide watch about two weeks later. He clarified that he was in four-point restraints only for some of the time that he was on suicide watch.

8

As to his claims against the second newly named defendant, Major Tim Crawford, Langley testified that Crawford served as the chairman of the disciplinary board that reviewed the disciplinary charges and requests for protective custody that were the subject of plaintiff's previous testimony.   Plaintiff stated that the last writeup he received concerned three charges arising from his suicide attempt on March 23, 2016.  He confirmed that he again received written charges and a hearing before the disciplinary board, where he was permitted to offer his own testimony.  He stated that he was found guilty of self-mutilation, deliberate disobedience and property damage, and that his penalty was loss of good time.  He confirmed that he has now lost more than 700 days of good time credit toward early release.

Before the Spears hearings, plaintiff filed a motion for a preliminary injunction or a protective order.  Record Doc. No. 9.  Plaintiff's motion alleges the following:

> Defendant Sgt. Beau Bowman . . . threated [sic] my safety and well being when he tr[ied] to put me the plaintiff in a two man cell with a (man-Predator) . . . .  The dates of th[ese] violations by the Defendant Sgt. Beau Bowman [were] (12/16/15, 12/21/15, 12/28/15 [and] 12/30/15). There [were] four Disciplinary Reports wrote [sic] up on me for refuseing [sic] to go in to this cells [sic].  This was all because I was feeling threated [sic].  This Sgt. Beau Bowman was trying to set me up and have something done to me.
>               . . . .
>               When I went to the Disciplinary Board, the Board take [sic] over (225) days good time from me.

Record Doc. No. 9 at pp. 3-4 (emphasis added).

## ANALYSIS

I.   STANDARDS OF REVIEW

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis.  28 U.S.C. § 1915A(a); Thompson v. Hicks, 213 F. App'x 939, 942 (11th Cir. 2007); Lewis v. Estes, 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998); Lewis v. Sec'y, DOC, No. 2:10-CV-547-FTM-29, 2013 WL 5288989, at *2 (M.D. Fla. Sept. 19, 2013), aff'd, 589 F. App'x 950 (11th Cir. 2014).  Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim upon which relief can be granted.  28 U.S.C. § 1915A(b)(1); Lewis v. Charlotte Corr. Inst. Emps., 589 F. App'x 950, 952 (11th Cir. 2014); Thompson, 213 F. App'x at 942; Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's

factual allegations and dismiss those claims whose factual contentions are clearly baseless.'"  <u>Macias v. Raul A. (Unknown), Badge No. 153</u>, 23 F.3d 94, 97 (5th Cir. 1994) (quoting <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989)).

The purpose of a <u>Spears</u> hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  <u>Spears</u>, 766 F.2d at 180.  "[T]he <u>Spears</u> procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  <u>Davis</u>, 157 F.3d at 1005.  The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  <u>Wilson v. Barrientos</u>, 926 F.2d 480, 481 (5th Cir. 1991); <u>Adams v. Hansen</u>, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  <u>Spears</u>, 766 F.2d at 182.

The court may make only limited credibility determinations in a <u>Spears</u> hearing, <u>Norton v. Dimazana</u>, 122 F.3d 286, 292 (5th Cir. 1997) (citing <u>Cay v. Estelle</u>, 789 F.2d 318, 326-27 (5th Cir. 1986), <u>overruled on other grounds by Denton v. Hernandez</u>, 504 U.S. 25, 112 S. Ct. 1728 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's

testimony at a <u>Spears</u> hearing." <u>Id.</u> (citing <u>Wilson</u>, 926 F.2d at 482-83; <u>Williams v. Luna</u>, 909 F.2d 121, 124 (5th Cir. 1990)).   However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"   <u>Gobert v. Caldwell</u>, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting <u>Banuelos v. McFarland,</u> 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a <u>Spears</u> hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, <u>Jackson v. Vannoy</u>, 49 F.3d 175, 176-77 (5th Cir. 1995); <u>Moore v. Mabus</u>, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible." <u>Id.</u> at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'" <u>Davis</u>, 157 F.3d at 1005 (quoting <u>McCormick v. Stalder</u>, 105 F.3d 1059, 1061 (5th Cir. 1997)).   "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not." <u>Moore</u>, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's complaint may be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous, because his claims lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims, or under <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).  Plaintiff's complaint, as amended by his testimony at the <u>Spears</u> hearing, fails to state a claim under the broadest reading.[1]

## II.    OPENING LEGAL MAIL

Langley alleges that defendant Bowman improperly opened his outgoing legal mail during a routine search of his cell.  The United States Court of Appeals for the Fifth Circuit has held that prison practices or restrictions concerning prisoner mail implicate two distinct but intertwined constitutional rights:  (1) the right of access to the courts, which the Supreme Court has indicated lies in both the Due Process Clause and the First Amendment, <u>Wolff v. McDonnell</u>, 418 U.S. 539, 575-76 (1974), and (2) the right to freedom of speech guaranteed by the First Amendment.  <u>Walker v. Navarro Cnty. Jail</u>, 4 F.3d 410, 413 (5th Cir. 1993); <u>Brewer v. Wilkinson</u>, 3 F.3d 816, 820 (5th Cir. 1993).  Specifically, the right of access to the courts is implicated only when the mail in question is legal in nature, while the right to free speech is relevant to claims involving both legal and non-legal mail.

---

[1]The court must "liberally construe briefs of <u>pro se</u> litigants and apply less stringent standards to parties proceeding <u>pro se</u> than to parties represented by counsel," <u>Smith v. Lonestar Constr., Inc.</u>, 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); <u>Moore v. McDonald</u>, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

Regardless what rights are implicated, however, it is clear that prisoners' constitutional rights with respect to mail are not absolute.  A prison practice or regulation may permissibly interfere with an inmate's mail, including his legal mail, if the practice is "reasonably related to a legitimate penological interest."  Morgan v. Quarterman, 570 F.3d 663, 666 (5th Cir. 2009) (quotation omitted) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); see Jackson v. Cain, 864 F.2d 1235, 1248 (5th Cir. 1989) (reasonableness standard applies to challenges to regulations as well as to actions of a prison official).

To the extent that Langley is complaining that the opening of his outgoing mail interfered with his constitutional right of access to the courts, it is well established that prisoners have such a constitutional right.  Bounds v. Smith, 430 U.S. 817, 821 (1977).  However, "[w]hile the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court."  Vaccaro v. United States, 125 F.3d 852, 1997 WL 574977, at *1 (5th Cir. 1997) (quotation omitted) (emphasis added); accord Manning v. Sumlin, 540 F. App'x 462, 463 (5th Cir. 2013) (citing Lewis v. Casey, 518 U.S. 343, 356 (1996); Brewer, 3 F.3d at 821).

Significantly, to state a claim that his constitutional right of access to the courts was violated, Langley must demonstrate that his position as a litigant was actually prejudiced.  Lewis, 518 U.S. at 356; Every v. Jindal, 413 F. App'x 725, 727 (5th Cir. 2011) (citing Lewis, 518 U.S. at 349-50; Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999));

14

Cochran v. Baldwin, No. 05-20100, 2006 WL 2418945, at *1 (5th Cir. Aug. 18, 2006);

Eason v. Thaler, 73 F.3d 1322, 1328 (5th Cir. 1996).  It is not sufficient for a prisoner to

establish only that his mail was opened outside of his presence or without his consent.

Walker, 4 F.3d at 413.  The inmate must "demonstrate that the alleged shortcomings . . .

hindered his efforts to pursue a legal claim."  Lewis, 518 U.S. at 351.  In Lewis, the

Supreme Court made clear that an inmate must establish actual injury to state a claim for

denial of his right of access to the courts.  In examining the particular claims of the inmates

in the Lewis case, the Court stated that the First Amendment right of prisoners to access

to the courts is the right to "have a reasonably adequate opportunity to file nonfrivolous

legal claims challenging their convictions or conditions of confinement."  Id. at 356

(emphasis added).

　　　　In this case, Langley's written submissions, even as expanded upon by his Spears

testimony, fail to state a cognizable Section 1983 claim for violation of his rights of either

access to the courts or free speech.  As to his First Amendment right of access to the courts

claim, Langley fails completely to allege actual injury to his position as a litigant, as

required in Lewis and its progeny.  The alleged opening of his legal mail during a routine

cell search had no effect on his court proceedings, and his access to the courts was not

prejudiced in any way.  His testimony established that he was able to send his letter to the

federal district court in Baton Rouge in a new envelope on the same day the letter was

opened.  It is clear from plaintiff's testimony that he suffered no actual injury or legal

prejudice of any kind resulting from the opening of his legal mail.  Accordingly, to the extent Langley claims that the opening of his mail interfered with his access to the courts, his claim is legally frivolous and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

As to his free speech rights, Langley does <u>not</u> allege deprivation of outgoing mail delivery.  He alleges only that his mail was opened, but not that it was undelivered or delayed.  He testified that he was able to send his non-legal letters to the warden in a new envelope after the letters were opened.  The Supreme Court "has never held that reading inmate mail violates the First Amendment." <u>Busby v. Dretke</u>, 359 F.3d 708, 722 (5th Cir. 2004).  Nonetheless, "'[a] prison official's interference with a prisoner's legal mail . . . may violate the prisoner's First Amendment right to free speech–i.e., the right to be free from unjustified governmental interference with communication.'" <u>Damm v. Cooper</u>, 288 F. App'x 130, 132 (5th Cir. 2008) (quoting <u>Brewer</u>, 3 F.3d at 820).  However, the Fifth Circuit has recognized a legitimate penological need for prison "personnel to open, review, and occasionally censor outgoing mail" because of concerns about possible threats to prison security, including ensuring that the mail does not contain contraband.  <u>Franco v. Collins</u>, No. 2:14-CV-148, 2015 WL 136544, at *1 (S.D. Tex. Jan. 8, 2015) (citing <u>Busby</u>, 359 F.3d at 721); <u>McCartney v. Keith</u>, No. 14-CV-230, 2014 WL 5092017, at *2 (W.D. La. Oct. 9, 2014) (citing <u>Busby</u>, 359 F.3d at 721).

16

In the instant case, the inspection of Langley's outgoing mail to the warden "did not involve legal mail and was not completely arbitrary," and the opening of one piece of legal mail to the court in the Middle District of Louisiana "was not completely arbitrary" when Langley admitted that the inspection occurred during a routine search of his cell.  Franco, 2015 WL 136544, at *2.  The opening of Langley's mail in these circumstances does not, standing alone, state any violation of his First Amendment free speech rights, when he was not deprived of mail delivery at all.

For the foregoing reasons, plaintiff's mail claim is legally frivolous in all respects and does not state a claim of violation of constitutional rights upon which relief can be granted under Section 1983.

III.   EXCESSIVE FORCE

Langley alleges that Sgt. Goings used excessive force and hurt him while removing his handcuffs.  Plaintiff was a convicted prisoner at the time of the incident about which he complains. The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"  Wilkins v. Gaddy, 559 U.S. 34, 34 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 4 (1992)).  The Supreme Court in Wilkins confirmed that the standards it had established in Hudson remain the law.

> The "core judicial inquiry," we held [in Hudson], was not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 7, 112 S. Ct. 995; see also Whitley

17

v. Albers, 475 U.S. 312, 319-321 . . . (1986).  "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . whether or not significant injury is evident. . . ."  Hudson, 503 U.S. at 9 . . . .

. . . . As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  503 U.S. at 9 . . . .  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Ibid. (some internal quotation marks omitted).  An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.  Ibid. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

Id. at 37-38.

The Supreme Court in Wilkins "left open the possibility of dismissal where the injury conclusively shows that the force applied was not unconstitutional."  Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010) (citing Wilkins, 130 S. Ct. at 1180) (emphasis added).  Wilkins confirmed that Hudson remains the touchstone for evaluating claims under the Eighth Amendment.  Thus, the Fifth Circuit's prior cases that relied on Hudson continue to provide binding legal standards for this court.

Under the Eighth Amendment and Section 1983, the appropriate inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Hudson, 503 U.S. at 6; accord Petta v. Rivera, 143 F.3d , 143 F.3d 895, 901 (5th Cir. 1998); Flowers v. Phelps, 956 F.2d 488, 491 (5th Cir. 1992).  Plaintiff need not show a significant injury to establish a constitutional violation; however, the extent of injury may be considered in determining whether the force

used was malicious, wanton or unnecessary.  Hudson, 503 U.S. at 7; Flowers, 956 F.2d at 491.  In addition, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (quoting Hudson, 503 U.S. at 9-10).

> The law thus
>
> require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury . . . .  [W]e do not permit a cause of action for every contact between a citizen and a police officer.  In just about every conceivable situation, some amount of force or contact would be too nominal to constitute a constitutional violation.  When the force used is insufficient to satisfy the legal standard necessary for recovery, the amount of force is de minimis for constitutional purposes.

Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (quotation omitted).  To determine whether injury caused by excessive force is more than de minimis for constitutional purposes, the context in which the force was used and all the surrounding circumstances must be examined.  Id.

Applying the foregoing legal principles in this case, I find that Langley has failed to state a cognizable Eighth Amendment violation for the following reasons.  Assuming the truth of Langley's allegations, Sgt. Goings used only the force necessary to the circumstances.  Nothing about the minimal injuries that Langley described indicates that Goings used force that was excessive to its need.  Rather, this was a limited and minimal use of force that resulted in minor and very short-term injuries.  Specifically, Langley

19

testified that the officers tried to remove the handcuffs with a key, but were having trouble removing one handcuff because the key would not work.  Langley stated that Goings twisted plaintiff's arm and pulled the restraint off, and that the key finally worked within five to ten minutes.  Langley said his right arm was numb for a few minutes, but the feeling returned when he moved his arm around.  He did not need any medical treatment.

Plaintiff's own testimony makes clear that he was subjected to minor physical contact and that the force used resulted in very minor, short-term injuries and was in no way malicious or sadistic.  The de minimis nature of plaintiff's physical injury, along with his testimony about the brief extent of defendant's contact with him, suggests that the force applied was also de minimis and not of constitutional magnitude.  See, e.g., Smith v. Givens, No. 09-0448-CG-M, 2010 WL 1780409, at *7-8 (S.D. Ala. Apr. 8, 2010), report & recommendation adopted, 2010 WL 1780407 (S.D. Ala. Apr. 30, 2010) (superficial abrasion, small scratch, hematoma and superficial laceration, which required no treatment and had no lasting effects, were de minimis injuries that failed to support excessive force claim); McCullough v. Quarterman, No. H-06-3974, 2008 WL 5061512, at *9 (S.D. Tex. Nov. 24, 2009) (inmate's slightly swollen face and four scratches that needed no treatment were de minimis injuries insufficient to establish constitutional violation); Renthrope v. Toffton, No. 05-1390, 2007 WL 37999, at *5 n. 6 (W.D. La. Jan. 4, 2007) (absence of any injury other than minor cut weighed in favor of officer under Hudson).

Cases in which federal courts have found that a prisoner stated a claim for excessive force based on an officer's yanking or pulling on the prisoner's handcuffed arms are distinguishable and not applicable here because those cases involved more severe applications of force and more serious injuries.  See, e.g., Fennell v. Quintela, 393 F. App'x 150, 152, 155 (5th Cir. 2010) (Prison officer allegedly grabbed handcuffed inmate's wrists and twisted them, resulting in injury, while his arms were confined in a cell's food tray slot.); Watts v. Smart, 328 F. App'x 291, 292, 293-94 (5th Cir. 2009) (evidence that defendants struck prisoner without provocation while he was in restraints created genuine fact issues whether force applied was excessive); Morris v. Trevino, 301 F. App'x 310, 313 (5th Cir. 2008) (Prisoner stated a claim for excessive force when he alleged that, despite his lack of provocation, officer twisted his arms into painful positions while his hands were handcuffed behind his back, yanked his hands through the tray slot opening of his cell, beat and punched on his arms, and punched him in the face.).

In short, Goings's physical contact with Langley resulted in de minimis injury and the force he used cannot be characterized as malicious, wanton or unnecessary.  Therefore, plaintiff cannot establish the essential elements of his excessive force claim.  For the reasons discussed above, no violation of a constitutional right occurred when Langley's arm briefly went numb as a result of the particular physical contact that occurred. Plaintiff's claim of excessive force should be dismissed.

IV.   RETALIATION

As to his retaliation claims, Langley alleges that Bowman opened his legal mail in retaliation for Langley having filed grievances against Bowman.  Plaintiff also claims that Goings twisted Langley's arm on Bowman's behalf in retaliation for Bowman having been served with the summons in this lawsuit on the previous day.

It is correct that prison officials may not retaliate against a prisoner for exercising his First Amendment rights of access to the courts or to complain through proper channels about alleged misconduct.  Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995).  However, the law in the Fifth Circuit concerning prisoner retaliation claims has undergone substantial evolution in recent years. It is based on the following general principles:

> The elements of a retaliation claim are the invocation of a specific constitutional right, the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, i.e., but for the retaliatory motive the complained of incident . . . would not have occurred.  With respect to the last element, we [have] emphasized that an action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate.

Clarke v. Stalder, 121 F.3d 222, 231 (5th Cir. 1997), vacated in part & reinstated in relevant part, 154 F.3d 186 (5th Cir. 1998) (citing Bounds v. Smith, 430 U.S. 817 (1977); Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997); Woods, 60 F.3d at 1164-66) (quotations and additional citations omitted).

In <u>Woods</u>, the Fifth Circuit, applying the general First Amendment principles addressed above, affirmed the district court's denial of defendants' motion for summary judgment.  Defendants had sought dismissal of a prisoner's claim based on allegedly false disciplinary charges by defendants in alleged retaliation for plaintiff's letters of complaint to a federal judge and the prison warden.  The Fifth Circuit agreed with the district court that the inmate's retaliation claim should be permitted to proceed, but in doing so it expressed the following caution:  "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." <u>Woods</u>, 60 F.3d at 1166 (citation and quotation omitted).  The Fifth Circuit warned that "trial courts must carefully scrutinize these claims."  <u>Id.</u>

> To state a claim of retaliation <u>an inmate must allege the violation of a specific constitutional right</u> and be prepared to establish that <u>but for</u> the retaliatory motive the complained of incident . . . would not have occurred.  This places a significant burden on the inmate . . . .  The inmate must produce <u>direct evidence of motivation</u> or, the more probable scenario, "allege a chronology of events from which retaliation may plausibly be inferred."

<u>Id.</u> (citations omitted) (emphasis added).

A year later, the Supreme Court reexamined the scope of prisoners' First Amendment right of access to the courts in <u>Lewis v. Casey</u>, 518 U.S. 343 (1996).  As previously discussed, <u>Lewis</u> made clear that an inmate <u>must establish actual injury</u> to state a claim for denial of his right of access to the courts.  <u>Id.</u> at 349-50.

A few years ago in <u>Morris</u>, a case of first impression in the Fifth Circuit, the court addressed "[w]hether an allegation of <u>de minimis</u> retaliatory acts can support a retaliation claim" under the First Amendment.  <u>Morris</u>, 449 F.3d at 684.  The court stated that

> [t]he question, however, is not whether the violation of [plaintiff's] constitutional rights was <u>de minimis</u>, but whether any violation occurred at all.  To establish a constitutional violation, an inmate must show that he suffered a qualifying adverse retaliatory act.  If the retaliation alleged by [plaintiff] does not pass this bar, he has suffered no constitutional injury.

<u>Id.</u>  The Fifth Circuit held that

> [t]he purpose of allowing inmate retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising constitutional rights.  Some acts, though maybe motivated by retaliatory intent, are so <u>de minimis</u> that they would not deter the ordinary person from further exercise of his rights.  Such acts do not rise to the level of constitutional violations and cannot form the basis of a § 1983 claim.
>        . . . .  Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights. . . .
>        With this standard in mind, we turn to the specific retaliation alleged by [plaintiff] to determine whether the actions of the [prison] officials would have deterred a person of ordinary firmness from exercising his First Amendment right to file grievances against prison officials.

<u>Id.</u> at 686 (citing <u>Crawford-El v. Britton</u>, 523 U.S. 574, 588 n.10 (1998)).

The Fifth Circuit's reasoning and rulings in <u>Morris</u> accord with the Supreme Court's holding in <u>Lewis</u> that a prisoner who brings a retaliation claim under the First Amendment must allege actual injury in order to assert a claim.  Furthermore, the alleged retaliatory acts must be more than de minimis, which means they must be capable of deterring a person of ordinary firmness from further exercising his constitutional rights.

24

Thus, the law in the Fifth Circuit

> is well established that prison officials may not retaliate against an inmate who exercises his right of access to court.  Officials likewise may not retaliate against an inmate for using the grievance system.  A plaintiff must allege facts showing that the defendant possessed a retaliatory motive.  The inmate must show <u>more than his personal belief that he was the victim of retaliation.  Mere conclusory allegations of retaliation are not enough.</u>

<u>Decker v. McDonald</u>, No. 5:09cv27, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010),

<u>report & recommendation adopted</u>, 2010 WL 1424292 (E.D. Tex. Apr. 7, 2010) (citing

<u>Morris</u>, 449 F.3d at 687; <u>Jones v. Greninger</u>, 188 F.3d 322, 324-25 (5th Cir. 1999); <u>Johnson</u>

<u>v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir. 1997); <u>Moody v. Baker</u>, 857 F.2d 256, 258 (5th

Cir. 1988); <u>Whittington v. Lynaugh</u>, 842 F.2d 818, 820 (5th Cir. 1988))   (additional

citations omitted) (emphasis added).

Accepting as true plaintiff's testimony and written allegations, he has not established

that a violation of his federal constitutional rights has occurred under the circumstances

described in his complaint.  As an initial matter, Langley cannot show either a retaliatory

motive for the opening of his legal mail or the arm-twisting, or that, but for a retaliatory

motive, these acts would not have occurred.  His allegations that Bowman retaliated for

plaintiff's filing of grievances by opening his mail or that Goings twisted plaintiff's arm

on Bowman's behalf as retaliation for filing the instant lawsuit do not give rise to any

plausible inference of retaliatory motive on the part of defendants and therefore do not

"state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678

(2009) (quotation omitted); <u>see</u> <u>Wolters v. Fed. Bureau of Prisons</u>, 352 F. App'x 926, 928

25

(5th Cir. 2009) (citing <u>Jones</u>, 188 F.3d at 325; <u>McDonald v. Steward</u>, 132 F.3d 225, 231 (5th Cir. 1998)) (claim that prison officials retaliated against inmate when they denied his requests to be assigned to a different unit of the prison and deliberately housed him with gang-affiliated inmates "fails because Wolters has not presented any evidence that any prison official acted with a retaliatory motive and has not alleged a chronology of events from which a retaliatory motive might plausibly be inferred"); <u>Bishop v. Does</u>, 350 F. App'x 941, 944 (5th Cir. 2009) (citing <u>Jones</u>, 188 F.3d at 325) (Inmate's claim that prison official transferred him out of a unit in retaliation for his previous litigation against staff members failed because he made only conclusory allegations and had no evidence of retaliatory intent.); <u>Leggett v. Comer</u>, 280 F. App'x 333, 336 (5th Cir. 2008) (retaliation claim was frivolous when inmate failed to show that his property would not have been missing but for his letter-writing about prison officials, and that retaliatory intent motivated the inadequate inventory and storage of his property).

In addition, Langley has failed to show any actual injury or actual infringement of his First Amendment right of access to the courts resulting from the alleged retaliation. He has not shown that a person of ordinary firmness would be deterred from exercising First Amendment rights as a result of his mail having been opened or the de minimis use of force and de minimis injury plaintiff suffered when Goings removed his handcuffs.

As previously discussed, the Supreme Court has <u>not</u> extended a prisoner's right of access to the courts to encompass more than the ability of an inmate to prepare and transmit

26

a necessary legal document to a court.  Manning, 540 F. App'x at 463 (citing Lewis, 518

U.S. at 356; Brewer, 3 F.3d at 821); Norton, 122 F.3d at 290; Eason, 73 F.3d at 1328.  To

state a claim that his constitutional right of access to the courts was violated, Langley must

demonstrate that his position as a litigant was actually prejudiced.  Lewis, 518 U.S. at 356;

Cochran, 2006 WL 2418945, at *1.

Langley wholly fails to establish any violation of his First Amendment rights.  It is

clear that he has submitted materials sufficient to prosecute this civil case and his other case

filed in the Middle District of Louisiana.  It is equally clear that no actual legal prejudice

to his position as a litigant of the type required by Lewis was caused by any action or

omission of the defendants.  "[C]ausation is an element of a section 1983 claim;

[defendants'] actions must have actually caused the deprivation . . . of which [plaintiff]

complains."  Hart v. O'Brien, 127 F.3d 424, 446 (5th Cir. 1997), abrogated in part on other

grounds as recognized in Spivey v. Robertson, 197 F.3d 772 (5th Cir. 1999); accord Brown

v. Bryan Cnty., 219 F.3d 450, 457 (5th Cir. 2000).  Langley has fully pursued his civil

actions in this court and the Middle District of Louisiana.

Thus, plaintiff's retaliation claim alleges no violation of a specific constitutional

right as a result of any allegedly retaliatory acts.  He has not shown the existence of

retaliatory motive, causation or actual prejudice to his position as a litigant.  Accordingly,

his retaliation claim is legally frivolous and fails to state a claim upon which relief can be

granted under Section 1983.

V.    FALSE DISCIPLINARY CHARGES/LOST GOOD TIME

Langley's claims that his constitutional rights were violated based on false or fabricated disciplinary charges resulting in his placement in extended lockdown and loss of substantial good time credit fail to state a claim of violation of his constitutional rights and must be dismissed.

In Sandin v. Connor, 515 U.S. 472, 481-83 (1995), the United States Supreme Court held that analysis of a prisoner's due process claim relating to his placement in lockdown or other denial of prison privileges as disciplinary punishment begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources–the Due Process Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983). In Sandin, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (citations omitted). Thus, in Sandin, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does not require that a prisoner be afforded the procedural mechanisms previously prescribed in Wolff v. McDonnell, 418 U.S. 539 (1974), and Hewitt, 459 U.S. at 460.

In addition, the Supreme Court intimated in <u>Sandin</u> that prison disciplinary proceedings resulting in the loss of good time credit may result in an "atypical and significant hardship" implicating due process concerns because they affect the duration of the inmate's imprisonment. <u>Sandin</u>, 515 U.S. at 479-84.  Without specifically addressing <u>Sandin</u>, the Fifth Circuit held in a case involving the Texas good time statute that prison disciplinary action that results in an inmate's loss of good time credits must be accompanied by certain procedural safeguards of the type described in the pre-<u>Sandin</u> Supreme Court decision in <u>Wolff</u>.  <u>Hallmark v. Johnson</u>, 118 F.3d 1073, 1080 (5th Cir. 1997).  Similarly, in <u>Madison v. Parker</u>, 104 F.3d 765, 768 (5th Cir. 1997), the Fifth Circuit stated that a prisoner's "loss of 30 days good time credit calls for a more careful analysis" of applicable due process principles.

In <u>Wolff</u>, the Supreme Court held that because disciplinary proceedings are not part of a criminal prosecution, the prisoner need not be afforded "the full panoply of rights" provided in criminal proceedings.  <u>Wolff</u>, 418 U.S. at 556.  Nevertheless, the <u>Wolff</u> Court held that prison officials must afford the prisoner <u>some</u> due process in disciplinary proceedings before imposing punishment, including notice of the violation, a hearing and some opportunity to present evidence on the prisoner's behalf.  <u>Id.</u>

"[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner."  <u>Madison</u>, 104 F.3d at 767.  "Prisoners held in lawful confinement have their liberty curtailed by definition, so

the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." <u>Wilkinson v. Austin</u>, 545 U.S. 209, 225 (2005) (citations omitted).  The Fifth Circuit held in <u>Madison</u> that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns." <u>Madison</u>, 104 F.3d at 768; <u>accord</u> <u>Hernandez v. Velasquez</u>, 522 F.3d 556, 563 (5th Cir. 2008); <u>Dixon v. Hastings</u>, 117 F. App'x 371, 372 (5th Cir. 2005); <u>Malchi v. Thaler</u>, 211 F.3d 953, 957-58 (5th Cir. 2000).  In <u>Hernandez</u> and <u>Madison</u>, the Fifth Circuit held that such restrictions do <u>not</u> represent the type of atypical, significant deprivation in which a state might create a liberty interest.  <u>Hernandez</u>, 522 F.3d at 563; <u>Madison</u>, 104 F.3d at 768.  Some examples of prison hardships that <u>would</u> qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital or extension of the prisoner's sentence for his underlying criminal conviction.  <u>Sandin</u>, 515 U.S. at 484.

In the instant case, Langley's testimony and written submissions establish that  the actions taken against him based upon the allegedly false disciplinary charges and resulting hearings were that he remained in extended lockdown in Level 1 and lost at least 700 days of good time credits.  It is well established that the imposition of extended lockdown does not constitute such an "atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life" that particular forms of process of the type described in Wolff were required.  Sandin, 515 U.S. at 484; Madison, 104 F.3d at 768; Johnson v. Livingston, 360 F. App'x 531, 532 (5th Cir. 2010) (citing Malchi, 211 F.3d at 958); Hernandez, 522 F.3d at 563; Dixon, 117 F. App'x at 372.

In addition, the case law is clear that an inmate's allegation that a prison official asserted false disciplinary charges against him fails to state a claim under Section 1983 when the prisoner is afforded due process protection through a subsequent hearing.  Harris v. Smith, 482 F. App'x 929, 930 (5th Cir. 2012) (quoting Collins v. King, 743 F.2d 248, 253-54 (5th Cir. 1984)); accord Doolittle v. Holmes, 306 F. App'x 133, 134 (5th Cir. 2009); Moore v. Butler, 211 F.3d 593, 2000 WL 329165, at *1 (5th Cir. Mar. 17, 2000).

On the other hand, "a forfeiture of 'good time' credit . . . normally prevents a due process claim from being foreclosed by Sandin" because it affects the quantity, rather than the quality, of time served.  Collier v. Dunaway, No. 08-4264, 2008 WL 4809467, at *2 (E.D. La. Oct. 31, 2008) (citing Madison, 104 F.3d at 768); Bean v. McConnell Unit, No. C-06, 223, 2006 WL 2346295, at *3 (S.D. Tex. Aug. 11, 2006)).  Nonetheless, Langley's due process claim regarding his lost good time credit, for which his complaint seeks declaratory, injunctive and monetary relief, must be dismissed at this time for two reasons.

First, Langley received all appropriate due process of the type required by Wolff in connection with his loss of good time credits.

"Where a prison disciplinary hearing may result in the loss of good time credits," due process requires: "(1) advance written notice of the disciplinary

31

charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in [the inmate's] defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action."

Arceneaux v. Young, 369 F. App'x 620, 620 (5th Cir. 2010) (quoting Superintendent v. Hill, 472 U.S. 445, 454 (1985)).

Langley testified that he received written descriptions of the charges against him and received a hearing before the disciplinary board each time that charges were brought. He stated that the board received the incident reports and gave him the opportunity to provide his own testimony about the incidents. Under these circumstances, plaintiff received adequate due process in connection with the disciplinary charges against him, even to the extent that the proceedings resulted in loss of good time credits. Id. (citing Wolff, 418 U.S. at 564-66). Langley therefore fails to state a due process claim for which he would be entitled to relief under Section 1983.

Second, in Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held that a civil action for alleged civil rights violations that attacks the validity of state confinement, which has not been reversed, expunged, invalidated, or called into question by a federal court's issuance of a writ of habeas corpus, is not cognizable under Section 1983.

[T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that

> relationship to a conviction or sentence that has <u>not</u> been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

<u>Id.</u> at 486-87 (emphasis in original) (footnote omitted).  Although the Supreme Court's decision in <u>Heck</u> concerned a civil action for monetary damages, the Fifth Circuit has also applied <u>Heck</u> in cases in which the plaintiff seeks injunctive relief, <u>Clarke v. Stalder</u>, 154 F.3d 186, 189 (5th Cir. 1998) (citing <u>Edwards v. Balisok</u>, 520 U.S. 641, 645-46 (1997)), and in cases alleging the loss of good time credit.  <u>Toppins v. Day</u>, 73 F. App'x 84, 2003 WL 21757342, at *5 (5th Cir. June 26, 2003) (citing <u>Edwards</u>, 520 U.S. at 648).

Langley's due process claim regarding the loss of good time is connected to the validity of the subject confinement to the extent he argues that his conviction of the disciplinary charges and the sanction of losing good time impact his release date.  <u>Heck</u>, 512 U.S. at 479; <u>Teague v. Quarterman</u>, 482 F.3d 769, 778-79 (5th Cir. 2007); <u>Toppins</u>, 2003 WL 21757342, at *5 (citing <u>Edwards</u>, 520 U.S. at 648); <u>Clarke</u>, 154 F.3d at 190. When a disciplinary action resulting in the loss of good time credits "has not been reversed or overturned," it "fails to meet <u>Heck</u>, [and is] . . . properly dismissed." <u>Toppins</u>, 2003 WL 21757342, at *5; <u>accord</u> <u>Swafford v. Cain</u>, No. 13-0788-JWD, 2014 WL 4418537, at *5 (M.D. La. Sept. 8, 2014) (citing <u>Edwards</u>, 520 U.S. at 648; <u>Montoya v. Jones</u>, 118 F. App'x 797, 798 (5th Cir. 2004); <u>Johnson v. Boland</u>, No. 2:12-CV-0113, 2012 WL 2358157, at *1 (N.D. Tex. May 31, 2012)).

Langley's complaint and testimony indicate that he was convicted of disciplinary charges based on his admitted disobedience to the transfer orders to Level 2 in December 2015 and of charges of self-mutilation, deliberate disobedience and property damage arising from his suicide attempt on March 23, 2016.  His penalty for conviction on all of these charges included loss of good time.  There is no indication in any of his written submissions or testimony that his convictions on the disciplinary charges were set aside in any of the ways described in <u>Heck</u>. Thus, any claims for relief that he asserts challenging his loss of good time credit are premature and must be dismissed under <u>Heck</u>.  As the Fifth Circuit has noted, the dismissal of plaintiff's Section 1983 claims is with prejudice to their being asserted again until the <u>Heck</u> conditions are met.  <u>Johnson v. McElveen</u>, 101 F.3d 423, 424 (5th Cir. 1996)).

VI.   <u>PROTECTIVE CUSTODY CLASSIFICATION</u>

Langley's allegations that he was in danger from other inmates housed in the Level 2 unit, to which he refused to be transferred, and that he should have been housed in protective custody implicate two possible obligations of defendants: (1) their responsibility for classification of prisoners within the jail and (2) their constitutional obligation to protect prisoners from harm.

Plaintiff has no constitutional right to a particular status or classification within any prison. The classification of inmates is an administrative function of the prison.  <u>Jones v.</u>

Diamond, 636 F.2d 1364, 1376 (5th Cir. 1981) (en banc).[2]  Courts accord great deference to prison officials' administrative decisions and will not interfere with legitimate administration without a constitutional violation.  Bell v. Wolfish, 441 U.S. 520, 547-48 (1979); Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990).  "Inmates have a federal right to due process at prison classification . . . only if state law contains 'substantive predicates' limiting the prison administrators' discretion to classify, assign, and punish inmates."  Ricker v. Leapley, 25 F.3d 1406, 1409 (8th Cir. 1994); accord Woods v. Edwards, 51 F.3d 577, 582 (5th Cir. 1995) (citing Hewitt v. Helms, 459 U.S. 460, 469-70 (1983)); Canterino v. Wilson, 869 F.2d 948, 953 (6th Cir. 1989) (citing Hewitt, 459 U.S. at 472.  "Classification of inmates in Louisiana is a duty of the . . . [jailer] and an inmate has no right to a particular classification under state law."  Woods, 51 F.3d at 581-82 (quotation omitted).

Thus, "[i]nmates have no protectable property or liberty interest in custodial classification.  The classification of prisoners is a matter within the discretion of prison officials.  Absent an abuse of discretion, federal courts are loathe to interfere with custodial classifications established by prison officials."  Whitley v. Hunt, 158 F.3d 882, 889 (5th Cir. 1998) (citations omitted), abrogated on other grounds by Booth v. Churner, 532 U.S.

---

[2]Overruled on other grounds by Int'l Woodworkers of Am. v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986), aff'd sub. nom. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437 (1987).

732, 735 (2001); <u>accord</u> <u>Jones v. Roach</u>, 196 F. App'x 287, 288 (5th Cir. 2006); <u>Wilkerson v. Stalder</u>, 329 F.3d 431, 436 (5th Cir. 2003).

Assuming the truth of Langley's individualized allegations, as described in his written submissions and testimony, it cannot be concluded that defendants' refusal to house him in protective custody was unconstitutional.  Plaintiff's subjective belief that he would be in danger if he transferred to the Level 2 unit is conclusory, unsupported and insufficient for the court to conclude that prison officials' discretionary decisions concerning how and where inmates should be housed were unconstitutional.

The circumstances described in Langley's testimony do not establish the objective unreasonableness of this particular housing decision.  Plaintiff testified that he refused to be transferred because he "felt threatened" by particular offenders housed in Level 2, although he admitted that he had previously engaged only in verbal, not physical, altercations with those offenders.  He stated that the disciplinary board denied him protective custody because they questioned the other offenders and believed them over Langley regarding whether they presented any threat to him.  Plaintiff admittedly suffered no harm as a result of not being held in protective custody.  In this instance, the failure to house Langley in protective custody cannot be characterized as arbitrary or indiscriminate or as an abuse of the discretion the law assigns to prison officials, with which this court should not interfere.  No violation of Langley's due process or other constitutional rights occurred under these circumstances.

Insofar as plaintiff's claim in this regard might be construed as an allegation of failure of the defendants to protect him from harm, Langley was a convicted inmate at the time of the events on which he bases his claims, so that the Eighth Amendment standard applies. Under the Eighth Amendment, prison officials have a duty to protect inmates from harm and to take reasonable measures to protect their safety. Farmer v. Brennan, 511 U.S. 825, 832-33 (1994); Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996). Prison officials can be held liable for their failure to protect an inmate only when they are deliberately indifferent to a substantial risk of serious harm. Farmer, 511 U.S. at 834; Newton v. Black, 133 F.3d 301, 308 (5th Cir. 1998).

Only deliberate indifference, "an unnecessary and wanton infliction of pain or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 105-06 (1976); accord Gregg v. Georgia, 428 U.S. 153, 182-83 (1976). "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (quotation omitted).

Further, plaintiff must establish that the defendant possessed a culpable state of mind. Id. (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  A prison official cannot be held liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  "Mere negligence or a failure to act reasonably is not enough.  The officer must have the subjective intent to cause harm."  Mace v. City of Palestine, 333 F.3d 621, 626 (5th Cir. 2003).  If the court finds that one of the components of the test is not met, it need not address the other component.  Davis, 157 F.3d at 1005.

> The Supreme Court has recently reaffirmed that "deliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  The deliberate indifference standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 551 (5th Cir. 1997) (citing Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997)) (additional citations and footnote omitted) (emphasis added).  "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference."  Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997).  Whether a prison official had the requisite knowledge of a substantial risk is a question of fact.  Farmer, 511 U.S. at 837; Newton, 133 F.3d at 308.

> [If a] plaintiff presents evidence showing that a substantial risk of . . . attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official

being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Farmer, 511 U.S. at 842-43.  Thus, in Adames v. Perez, 331 F.3d 508 (5th Cir. 2003), the Fifth Circuit vacated and remanded a jury verdict in favor of an inmate, holding that evidence of isolated previous attacks was insufficient to show deliberate indifference to an inmate's safety or to support a jury's verdict that prison officials failed to protect the inmate.

It cannot be concluded that defendants in this matter unconstitutionally exposed Langley to a substantial risk of serious harm.  As his testimony confirms, he did not suffer any actual harm from other inmates as a result of defendants' failure to place him in protective custody.  Plaintiff's testimony also indicates that defendants had no knowledge of any past physical assault or other force by other inmates against him and that no such prior incidents of harm or actual threats ever occurred.  Langley testified that he had engaged only in prior verbal, not physical, altercations, with particular offenders housed in Level 2.  He stated that, when he complained that he felt threatened by these other inmates, jail officials questioned the other offenders and believed them over plaintiff regarding whether any threat was presented.  Thus, defendants did not disregard Langley's complaints.  Rather, they interviewed the other inmates and determined that plaintiff's allegations were less credible than the other inmates.

Under these circumstances, it cannot be said that defendants knew of and disregarded an excessive risk to Langley's health or safety.  Plaintiff's testimony in this regard, even if accepted as true in its entirety for present purposes, does not rise to the level of deliberate indifference to a known risk of substantial harm required to establish a constitutional violation.  See Curbow v. Jackson, 307 F. App'x 828, 829 (5th Cir. 2009) (quotations and citations omitted) (Even if plaintiff had shown that defendants were aware of a risk to his safety, no liability exists "if an official reasonably responded to a known substantial risk, even if the harm was ultimately not averted."); Longoria v. Texas, 473 F.3d 586,  594 (5th Cir. 2006) (quotation omitted) ("[R]esponding to an inmate's complaints by referring the matter for further investigation or taking other appropriate administrative action fulfills an official's protective duties under the Eighth Amendment.").

Because defendants had no knowledge of a substantial threat of serious harm to Langley's safety, they did not act with deliberate indifference.  Id.  Accordingly, Langley has failed to alleged the requisite elements of deliberate indifference and cannot state a cognizable Section 1983 claim for failure to protect him from a known risk of harm.

VIII.   MOTION FOR PRELIMINARY INJUNCTION/PROTECTIVE ORDER

Plaintiff's motion for a preliminary injunction or a protective order alleges that

Defendant Sgt. Beau Bowman threated [sic] my safety and well being when he tr[ied] to put me the plaintiff in a two man cell with a (man-Predator) . . . . The dates of th[ese] violations by the Defendant Sgt. Beau Bowman [were] (12/16/15, 12/21/15, 12/28/15 [and] 12/30/15).   There [were] four Disciplinary Reports wrote [sic] up on me for refuseing [sic] to go in to this

40

cells [sic].  This was all because I was feeling threated [sic].  This Sgt. Beau Bowman was <u>trying</u> to set me up and have something done to me.
              . . . .
      When I went to the Disciplinary Board, the Board [took] over (225) days good time from me.

Record Doc. No. 9 at pp. 3-4 (emphasis added).  Langley does not specify what injunctive

relief he seeks, but it appears that he requests protective custody.

      According to Rule 65(b) of the Federal Rules of Civil Procedure, a party seeking a

preliminary injunction must set forth "specific facts in an affidavit or a verified complaint"

that "clearly show that immediate and irreparable injury, loss, or damage will result to the

movant."   A preliminary injunction is an <u>extraordinary</u> equitable remedy that may be

granted <u>only</u> if plaintiff clearly carries his burden of establishing four essential elements:

(1) a substantial likelihood of success on the merits; (2) a substantial threat that he will

suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any

damage that the injunction might cause defendants; <u>and</u> (4) the injunction will not disserve

the public interest.   <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008);

<u>Voting for Am. Inc. v. Steen</u>, 732 F.3d 382, 386 (5th Cir. 2013); <u>Planned Parenthood Ass'n

of Hidalgo Cnty. Tex., Inc. v. Suehs</u>, 692 F.3d 343, 348 (5th Cir. 2012); <u>S. Co. v. Dauben

Inc.</u>, 324 F. App'x 309, 314 (5th Cir. 2009).  Part of the requisite showing is "a <u>substantial</u>

threat of <u>irreparable</u> injury if the injunction is not issued."   <u>DSC Commc'ns Corp. v. OGI

Techs., Inc.</u>, 81 F.3d 597, 600 (5th Cir. 1996) (emphasis added); <u>accord</u> <u>S. Co.</u>, 324 F.

App'x at 319.

Applying the foregoing legal standards to the facts plaintiff alleges, his written submissions and the record establish that he is <u>not</u> entitled to a preliminary injunction. First, a hearing has been held pursuant to <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and I have recommended that plaintiff's complaint be dismissed in its entirety for all the reasons set out above.  Thus, it cannot be concluded that the complaint presents "a substantial likelihood of success on the merits."  <u>Pharm. Research & Mfrs. of Am. v. Walsh</u>, 538 U.S. 644, 662 (2003) (citation omitted); <u>DSC Commc'ns Corp.</u>, 81 F.3d at 600. In addition, the potent affirmative defense of qualified immunity is available to all defendants.

Second, Langley has not established that he faces a substantial threat of serious injury that would be irreparable.  His own testimony and written allegations establish that he was never actually exposed to or housed with any of the other inmates whom he feared would injure him.  His testimony establishes that the inmates whom he feared have now been transferred to other parts of Rayburn and are not housed with Langley.  In addition, injury or other harm is not irreparable for Rule 65 purposes if an adequate alternate remedy in the form of money damages is available.  11A C. Wright, A. Miller, et al., <u>Federal Practice and Procedure</u> § 2948.1, text at n.2 and cases cited therein (3d ed., on Westlaw at database FPP 2948.1).  "<u>Speculative</u> injury is not sufficient," and only "a <u>strong</u> threat of irreparable injury before trial" will serve as an adequate basis for preliminary injunctive relief.  <u>Id.</u> text at nn. 9, 12 (emphasis added).  Although, "[w]hen an alleged deprivation of

a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," id. text at n. 26, Langley has failed to establish any such constitutional violation, all as discussed above.  Thus, the second factor also weighs against granting his motion.

Finally, the third and fourth factors – (a) balancing of the threatened injury against any damage it might cause to defendants and (b) the public interest – are related in this instance.  I find that defendants' interests and the damage they may suffer by entry of the sort of court order sought by Langley would involve this court's unwarranted interference with the administration of prison functions, including the maintenance of security and jailhouse discipline and appropriate custodial classification, in a way that would disserve the public interest.  Courts must accord great deference to prison officials' administrative decisions and will not interfere with legitimate administration, including especially the "essential goals" of "maintaining institutional security and preserving internal order and discipline," in the absence of a constitutional violation.  Bell v. Wolfish, 441 U.S. 520, 546-48 (1979); Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990).  Similarly, when a state statute vests state officials with broad discretionary authority concerning the placement of prisoners in a particular status or facility and in the transfer of prisoners from one prison to another, the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration.  See Olim v. Wakinekona, 461 U.S. 238, 249-50 (1983) (Hawaii prison regulations vesting prison

administrators with broad discretion concerning inmate placement and transfers create no liberty interest protected under the Due Process Clause); Brumfield v. Natchitoches Parish Det. Ctr., No. 15-CV-1883, 2015 WL 9673901, at *3 (W.D. La. Nov. 12, 2015), report & recommendation adopted, 2016 WL 99123 (W.D. La. Jan. 7, 2016), appeal filed, No. 16-30054 (5th Cir. Jan. 22, 2016) (quoting Woods v. Edwards, 51 F.3d 577, 581-82 (5th Cir. 1995)) ("'Classification of inmates in Louisiana is a duty of the [jailer] and an inmate has no right to a particular classification under state law.'"); Scott v. Louisiana, No. 14-2262, 2015 WL 3439098, at *5 (E.D. La. May 26, 2015) (same); Merit v. Lynn, 848 F. Supp. 1266, 1267-68 (W.D. La. 1994) (Louisiana parole statute is broadly discretionary and creates no constitutionally protected liberty interest).

Under these circumstances, Langley has not established the four factors necessary to obtain a protective order or other preliminary injunctive relief before trial.  On balance, all four factors weigh in favor of denying his motion.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that (1) plaintiff's motion for injunctive relief or protective order, Record Doc. No. 9, be DENIED, and (2) plaintiff's complaint asserting claims pursuant to 42 U.S.C. § 1983 be **DISMISSED WITH PREJUDICE**, either as legally frivolous, for failure to state a claim on which relief may be granted under 28 U.S.C. § 1915(e)(2), or under Heck.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[3]

New Orleans, Louisiana, this ____8th____ day of August, 2016.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[3]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

45